STEVEN D. ARAKIE, Plaintiff-Appellee, *v.* GERALD HATOFF *et al.,* Defendants-Appellants.

(No. 55340; ▮▮▮▮▮▮▮

First District—May 16, 1972.

*Rehearing denied June 13, 1972.*

McDermott, Will & Emery, of Chicago, (Hamilton Smith and James E. Betke, of counsel,) for appellants.

Ronald S. Davis, of Chicago, (Alvin D. Meyers, of counsel,) for appellee.

Mr. JUSTICE SCHWARTZ delivered the opinion of the court:

Plaintiff brings this action for an alleged breach of fiduciary duty in connection with the purchase of stock over-the-counter for plaintiff's account. The case was tried by the court without a jury and the court entered judgment in favor of plaintiff in the amount of $2,400, plus 6 per cent per annum interest from June 1, 1968. Defendant appeals and contends that the court predicated its conclusion on a false assumption as to how the transaction must have occurred, rather than upon the weight of the evidence as to how it did occur. The facts follow.

On May 15, 1968, plaintiff, through Hallgarten & Company, sold 800 shares of National Patent Development stock, traded over-the-counter, at $137, and 200 shares of the same stock at $138. This was a "short sale"; that is, plaintiff did not own National Patent shares, but relied on his ability to buy the stock at a lower price before the settlement date, thus meeting the agreed requirement of delivering the stock, and also making a profit for himself.

In order to finance the transaction, plaintiff sought financing from defendant Hatoff as president of Gibraltar Corporation. That company made loans collateralized by stock, and was registered as a lender with the Federal Reserve Board. There was a dispute at the trial as to how plaintiff and defendant met to discuss the financing. Plaintiff testified he called defendant and arranged a meeting. Defendant testified that he was contacted by Arthur Mintz, an attorney and a mutual acquaintance of plaintiff and defendant. Mintz told defendant of plaintiff's need of financing, and set up a meeting. His testimony corroborated defendant's version of their original meeting.

On May 16, 1968, the parties met in Mintz' office, where defendant agreed to purchase, as agent for plaintiff, one thousand shares of National Patent Development stock at such prices as plaintiff directed. While the agreement to purchase is not disputed, the details, as determined by agreement at the meeting, are disputed. Defendant testified that he told plaintiff he would be interested in purchasing the stock if the price fell below $137; that plaintiff told him Hallgarten (the broker) would be "stuck" if the stock went above $137; and that plaintiff signed a power of attorney running to him. Plaintiff denied that defendant said he would buy only if the price of the stock went down, and he did not recall making

the statement about the broker being "stuck" if the price rose. He testified that he signed a blank power of attorney. Mintz testified, corroborating defendant's testimony.

On May 20, 1968, the price of the National Patent stock dropped, and at 10:00 A.M., was down to $105 bid, $120 asked. Defendant was speaking to the plaintiff on the telephone while he had his broker, Goldberg of Bear, Stearns & Co., on another line. He relayed the price information from the broker to the plaintiff, and plaintiff instructed defendant to buy 100 shares of National Patent at $120, which defendant ordered through his broker on the other telephone. The broker then informed defendant that he had 200 more shares available at $120, and defendant relayed that information to plaintiff. Plaintiff, according to defendant's testimony, refused the additional 200 shares because he felt the price would drop lower. Defendant then ordered the 200 shares for his own account from Goldberg, and requested two confirmation slips— one for 100 shares and one for 200 shares.

Plaintiff testified to a different version of the dealings had on May 20, 1968. He stated that when defendant told him the price was $105 bid, $120 asked, he told defendant to buy 300 shares; that defendant agreed and said, "Okay, I'll be back to you." He testified that the next time defendant called he reported that he could get only 100 shares at $120, and that the market was then up to $125.

Defendant, after learning that the price of the stock had risen to $125, sold the 200 shares he allegedly purchased for himself through another brokerage house, Rodman and Renshaw, for $124.50. At the same time he purchased 200 shares from Rodman for $125 for plaintiff's account and an additional 200 shares for the same price from Goldberg, with plaintiff's approval. The next day, May 21, 1968, plaintiff found that the price of National Patent was up to $128 bid and $135 asked, and he instructed defendant to purchase 500 shares at $135 or better, for he feared he would not be able to make his contract with Hallgarten. That day defendant purchased 500 shares at $132 through Goldberg for plaintiff's account.

Within five days after May 20, 1968, the day defendant allegedly purchased stock for both plaintiff and himself, he received a confirmation slip from Goldberg for 300 shares at $120 per share. He testified that he called Goldberg and told him he had made a mistake in sending one confirmation slip, and requested two, one for 100 and the other for 200 shares. The two slips were sent to him and were marked "duplicate." Two employees of Bear, Stearns & Co. testified that the slips were so marked at defendant's request, but defendant testified that he did not know why

they were marked "duplicate." Plaintiff was demanding a confirmation slip for the 100 shares at $120, but defendant did not give him one until he received the duplicate slip from Goldberg.

Defendant never told plaintiff that he purchased any National Patent stock for his account. Plaintiff learned that defendant purchased 300 shares at $120, rather than 100 shares, when he called Bear, Stearns' New York office. He then filed suit against defendant for breach of fiduciary duty.

During the trial the court made several comments about the plaintiff and defendant, referring to the plaintiff as an evasive witness who did not tell the whole truth. The court termed both parties as "bad guys" and stated that he would like to see both of them out of the market. The court then entered a decree which found that plaintiff directed defendant to purchase 300 shares of National Patent Development stock at $120 per share, and that defendant falsely advised plaintiff that he was able to purchase only 100 shares at $120, and entered judgment for plaintiff in the sum of $2,400 [$132 minus $120 times 200 shares], plus six per cent interest.

We proceed to defendant's contention that the trial court erred in predicating its conclusion on the false assumption as to how the transaction must have occurred, rather than upon the weight of the evidence as to how it did occur. Defendant argues that the trial judge did not base his findings on the weight of the evidence, but that he rendered his decision on the basis of erroneous inferences drawn from undisputed facts. He points to several remarks of the trial judge to the effect that he did not believe the transaction took place as defendant said because it would have been an unreasonable gamble for defendant; that he did not believe plaintiff would refuse 200 shares at $120 and one hour later purchase 200 shares at $125; and that he did not believe the defendant thought the market was going up when he bought the 200 shares for his own account at $120.

The question to be determined by the trier of fact was whether the plaintiff directed defendant to purchase 300 shares initially, as plaintiff contends, or only 100 shares, as defendant contends. The trial judge as the trier of fact found that plaintiff had directed defendant to purchase 300 shares.

██ A reviewing court will not reverse a ruling on a factual question unless there has been a clear abuse of discretion by the trial court. (*Lukich v. Angeli*, 31 Ill.App.2d 20.) The credibility of witnesses is for the trial court, and the findings of the trial jury in non-jury cases will not be disturbed unless they are manifestly against the weight of the evidence. (*Brown v. Zimmerman*, 18 Ill.2d 94; *Hunter v. DeMay*, 124

Ill.App.2d 429.) The findings of the trial judge will not be overturned if there is sufficient competent evidence in the record to sustain those findings. *Brown v. Zimmerman, supra; Hunter v. DeMay, supra.*

■■ In the instant case there was ample evidence to support the finding of the trial judge. Defendant admitted that he did not tell the plaintiff of his purchase of 200 shares for himself, although plaintiff was on the telephone at the time the defendant made his purchase. When defendant sold his 200 shares it was through a broker he did not ordinarily use, and there is a fair inference that he did so to avoid plaintiff's hearing of it. Defendant told plaintiff that he had never received a confirmation slip, although, he had in fact received one for 300 shares. The record amply supports the trial court's conclusion, and the judgment is affirmed.

Judgment affirmed.

STAMOS, P. J., and LEIGHTON, J., concur.